INTERSTATE COMMERCE COMMIS-
SION, Plaintiff, Appellant,

v.

B & T TRANSPORTATION CO. and
Bos-Taun Consolidating Co., Inc.,
Defendants, Appellees.

No. 79–1189.

United States Court of Appeals,
First Circuit.

Argued Sept. 12, 1979.

Decided Jan. 21, 1980.

Michael Martin, Chief, Section of Litiga-tion, Bureau of Investigations and Enforce-ment, Washington, D. C., with whom Peter M. Shannon, Jr., Director, Washington, D. C., and John F. Curley, Regional Counsel, Boston, Mass., were on brief, for plaintiff, appellant.

Gary R. Greenberg, Boston, Mass., with whom Carl K. King, and Goldstein & Ma-nello, Boston, Mass., were on brief, for de-fendants, appellees.

Before COFFIN, Chief Judge, CAMP-BELL, Circuit Judge, DOOLING, Senior District Judge.*

COFFIN, Chief Judge.

The Motor Carrier Act of 1935 forbids common carriers by motor vehicle to "charge . . . a greater or less or dif-ferent compensation for transportation or for any service in connection therewith be-tween the points enumerated in such tariff than the rates, fares, and charges specified in the tariffs in effect at the time . . ." 49 U.S.C. § 317(b). Bos-Taun Consolidating Co., Inc., is a local consolidator, with its only place of business in Somerville, Massa-chusetts, which had no tariffs on file with the Interstate Commerce Commission (I.C.C.) to cover its consolidation charges.[1] B & T Transportation Co. is a certificated interstate motor carrier. On May 31, 1978,

---

* Of the Eastern District of New York, sitting by designation.

1. "Consolidation" in the motor carrier industry generally consists of aggregating small ship-ments into larger shipments and breaking down large shipments into smaller shipments. In providing these services, a consolidator acts as an agent of the shipper or receiver, rather than the carrier.

the I.C.C. filed a complaint in the United States District Court for the District of Massachusetts against B & T and Bos-Taun, alleging that defendants, acting together, charged customers for consolidating services with no tariff in effect reflecting the rate or charge for those services, in violation of 49 U.S.C. §§ 316(b), (d), and 317(b).[2] The I.C.C. bases its complaint upon the charge that B & T and Bos-Taun are owned, controlled, and managed in common as a single transportation enterprise. Bos-Taun's consolidation charges therefore should be deemed to be charges of B & T, the I.C.C. claims, and as such must be listed in tariffs on file with the I.C.C. The I.C.C. sought an injunction to restrain these activities pursuant to 49 U.S.C. § 322(b)(1). The I.C.C. also sought, on behalf of the shippers who had used Bos-Taun's consolidation services, restitution of Bos-Taun's overcharges.[3]

The district court granted summary judgment for defendants. The I.C.C.'s request for an injunction was denied on grounds of mootness, since it was found that B & T was selling its operating rights as a motor carrier and withdrawing from that activity. The district court denied the I.C.C.'s request for restitution on the ground that the Motor Carrier Act "does not confer upon the I.C.C. the right to sue for recovery of damages." The court noted that § 304a of the Act authorizes shippers, the injured parties, to sue to recover charges made by a carrier in violation of the Act, but that neither the language of § 304a nor its legislative history shows any congressional intent to allow the I.C.C. to seek damages for the benefit of injured shippers. On appeal, the I.C.C. challenges these two district court determinations.

■ The decision whether an injunction shall be granted is a matter within the discretion of the district court. We think it clear that the district court reasonably exercised its discretion in finding that there is no reasonable expectation that B & T's alleged illegal conduct will recur. Plaintiff has not contested the affidavit of Albert P. Sagansky, the Vice President of B & T, which states that B & T has sold most of its operating rights as a motor carrier and is in the process of selling the remainder. Without any significant threat of further violation, the fact that defendants insist on the legality of their past conduct is irrelevant. See United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In the unlikely event that a future violation should occur, the I.C.C. can seek an injunction at that time.

■ As a question of first impression, there might well be doubt about the I.C.C.'s power to seek restitution in view of the lack of any express, or even implicit, authorization of such power in the language of the Motor Carrier Act. Section 322(b)(1) of the Act provides:

"If any motor carrier . . . operates in violation of any provision of this chapter . . . the Commission . . . may apply for the enforcement thereof to the district court of the United States . . . The court shall have jurisdiction to enforce obedience . . . by a writ of injunction or other process, mandatory or otherwise, restraining such car-

2. The Interstate Commerce Act was recodified without substantive change in Pub.L.95–473. The relevant portions of sections 316(b), 316(d), and 317(b) now appear at 49 U.S.C. § 10702, § 10701, and § 10761, respectively, sections 304a and 322 at 49 U.S.C. § 11706 and § 11702, respectively. In keeping with the district court's opinion and the parties' briefs, we will for convenience use the old designations.

3. "Overcharges" are "charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the Commission [in violation of § 317(b)]." 49 U.S.C. § 304a(6). "Reparations" are "damages

resulting from charges for transportation services to the extent that the Commission, upon complaint made as provided in section 316(e) of this title, finds them to have been unjust and unreasonable [in violation of §§ 316(b) and (d)]." 49 U.S.C. § 304a(5). The ICC's original complaint relies on both § 317(b) and § 316, and the district court refers to both in its opinion, although the ICC emphasized overcharges rather than reparations in its brief and at oral argument. Under our decision here, it will be left to the district court to determine which form of relief, if any, is most appropriate, infra.

rier . . . and such other person, or persons, acting in concert or participating with such carrier . . . from further violation. . . ."

By its terms this provision empowers the I.C.C. to seek only prospective injunctions to restrain future conduct, not restitution. Furthermore, as the district court emphasized, section 304a makes no mention of any authority in the I.C.C. to seek restitution on behalf of injured shippers. If we were writing on a blank slate, we might agree with the district court that the language of the Motor Carrier Act cannot justify the authority the I.C.C. claims. Despite our sympathy with the district court's conclusion, however, a review of applicable Supreme Court precedent compels us to reach a contrary holding.

In *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), the Supreme Court held that the Administrator of the Office of Price Administration could seek restitution of rents charged in excess of applicable rent control regulations issued under the Emergency Price Control Act of 1942, even though there was no language in the Emergency Price Control Act expressly conferring such authority. The Court stated its holding in broad terms:

". . . [T]he Administrator invoked the jurisdiction of the District Court to enjoin acts and practices made illegal by the Act and to enforce compliance with the Act. Such a jurisdiction is an equitable one. Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. . . . Power is thereby resident in the District Court, in exercising this jurisdiction, 'to do equity and to mould each decree to the necessities of the particular case.' *Hecht Co. v. Bowles*, 321 U.S. 321, 329 [64 S.Ct. 587, 88 L.Ed. 754]. . . . [T]he court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. . . .

"Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Id.* at 397–98, 66 S.Ct. at 1089.

The Court went on to find that under the Emergency Price Control Act's provision that " '. . . upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond . . .' ", *id.* at 397, 66 S.Ct. at 1089, the term "other order" included an award of restitution. Thus the Act did contain affirmative authorization for the authority the Administrator claimed. *Id.* at 399, 66 S.Ct. 1086.

Defendants rely on *United States v. Parkinson*, 135 F.Supp. 208 (S.D.Cal.1955), aff'd, 240 F.2d 918 (9th Cir. 1956), where the Food and Drug Administration was denied authority to seek restitution on behalf of purchasers of misbranded drugs. In *Parkinson*, *Porter* was distinguished on the ground that *Porter* rested on a finding that the "other order" language in the Emergency Price Control Act constituted affirmative statutory authorization. 135 F.Supp. at 210–11. The Court's other remarks were said to be mere dictum, 135 F.Supp. at 211, uttered in an emergency wartime setting, 240 F.2d at 920, and so without lasting authority.

Four years later, however, the Supreme Court in *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960), resoundingly affirmed the vitality of its broad holding in *Porter*. Writing for the Court, Mr. Justice Harlan quoted *Porter's* expansive language approvingly, noting that

"The applicability of this principle [that equitable jurisdiction is not to be limited without a clear legislative command] is not to be denied, either because the Court there considered a wartime statute, or because, having set forth the governing inquiry, it went on to find in the language of the statute affirmative confirmation of the power to order reimbursement. . . . When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. As this Court long ago recognized, 'there is inherent in the Courts of Equity a jurisdiction to . . give effect to the policy of the legislature.' *Clark v. Smith* [38 U.S. 195], 13 Pet. 195, 203 [10 L.Ed. 123]." *Id.* at 291–92, 80 S.Ct. at 335.

The *DeMario* Court went on to hold that the Labor Department could seek restitution of lost wages to employees who had been discharged in violation of the Fair Labor Standards Act, *id.* at 296, 80 S.Ct. 332, even though that Act only gave the district courts jurisdiction " 'for cause shown, to restrain violations of section 15 . . . .' ", *id.* at 289, 80 S.Ct. at 334. Since 1960 the principles of *Porter* and *DeMario* have been reaffirmed and applied in a number of different contexts. *See, e. g., Renegotiation Bd. v. Bannercroft Clothing Co., Inc.,* 415 U.S. 1, 18–20, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974); *Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211, 1222–23 (7th Cir. 1979), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *United States v. Coca-Cola Bottling Co. of Los Angeles,* 575 F.2d 222, 228–30 (9th Cir. 1978), *cert. denied sub nom., Aqua Media, Ltd. v. United States,* 439 U.S. 959, 99 S.Ct. 362, 58 L.Ed.2d 351; *United States v. Beatrice Foods Co.,* 493 F.2d 1259, 1271–72 (8th Cir. 1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438. *But see United States v. C. E. B. Prods., Inc.,* 380 F.Supp. 664, 666–72 (N.D.Ill.1974).

The statutory provision considered in *DeMario*, which conferred a right on the agency to seek equitable relief restraining violations, is basically similar to the statutory language at issue in the case at bar. Both used fairly restrictive language to confer jurisdiction upon the district courts to enjoin and restrain future violations. It is difficult to see how we could deny equitable jurisdiction to order restitution of overcharges in this case without disregarding *DeMario.* The law is settled that when Congress entrusts to an equity court the enforcement of regulatory prohibitions, the court may carry out the full range of equitable remedies needed "to provide complete relief in light of the statutory purposes." *Id.* The court's equitable powers are limited only by clear statutory language, or by "necessary and inescapable inference" from statutory language to the contrary.

The fact that injured shippers are given a right to sue to recover overcharges in § 304a does not militate against this result. While § 304a confers no affirmative authority on the I.C.C. to seek restitution of overcharges on shippers' behalf, it contains no language expressly or impliedly denying such authority. Under *Porter* and *DeMario*, the latter fact, not the former, is dispositive.

The legislative history of § 304a in no way contradicts this conclusion. As originally enacted in 1949, § 304a provided only for shipper suits to recover overcharges, 1949 U.S.Code Cong.Serv. pp. 1429–30; it was amended in 1965 to allow shippers to sue for reparations as well, 1965 U.S.Code Cong. & Admin.News, pp. 2923, 2931. Had Congress in 1949 intended to create a wholly new remedy by which shippers could recover for past overcharges, failure to provide for any corresponding I.C.C. authority to act on shippers' behalf might seem meaningful. In fact, however, the legislative history indicates that Congress in 1949 believed that a common-law remedy already existed by which shippers could sue to recover overcharges.[4] Congress' primary pur-

---

4. *To Amend the Interstate Commerce Act— Undercharges and Overcharges: Hearings Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce,* 81st Cong., 1st

pose in enacting § 304a was to provide a uniform federal statute of limitations for these suits, replacing the various state limitations provisions.[5] The original § 304a, therefore, merely standardized the remedies available to shippers.

It is clear, on the other hand, that the 1965 amendment to § 304a, allowing shippers to sue for reparations, did more than standardize existing remedies. However, the congressional intent was merely to restore the remedy shippers had been thought to have before *T. I. M. E. Inc. v. United States*, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), which had held that no common-law reparations remedy existed under the savings clause, 49 U.S.C. § 316(j), of the Motor Carrier Act. 1965 U.S.Code Cong. & Admin.News, pp. 2924, 2931. The 1965 amendment also aimed to provide shippers by motor carrier with a reparations remedy parallel to that available to shippers by rail and water carriers under parts I and III of the Act, respectively. 1965 U.S.Code Cong. & Admin.News, pp. 2925, 2939–41. There was no reason, therefore, that in connection with the enactment of the original or the amended § 304a any thought should have been given to questions of the I.C.C.'s authority or of the equity power of the district courts. It may be that no one in 1949 or 1965 would have thought that the I.C.C. possessed the authority it now claims. Under *Porter* and *DeMario*, however, the traditional power of an equity court to grant complete relief may be said to have provided the I.C.C. with residual, untapped authority to seek equitable restitution once it has properly invoked the equity jurisdiction of the district courts.

Thus, we affirm the district court's denial of a prospective injunction and remand to the district court with instructions to entertain the I.C.C.'s request for equitable restitution. All we have held with regard to restitution is that the district court does possess equitable power to grant the relief sought by the I.C.C. It is for the district court on remand to determine whether and how it should exercise its equitable power, i. e., to decide what relief, if any, is necessary "to provide complete relief in light of the statutory purposes." *DeMario, supra*, at 361 U.S. 292, 80 S.Ct. at 335.

Many issues, not briefed, or argued by the parties before us, may attend this determination. For example, the district court must consider whether the I.C.C., by obtaining restitution on behalf of smaller shippers who might have lacked a financial incentive to bring suit themselves under § 304a, can help to vindicate the statutory policy of deterring violations of § 317 and § 316. If restitution is found appropriate, the court must then consider whether Bos-Taun may be liable for the full value of all its charges made without filed tariffs, or may instead be entitled to retain the reasonable value of the consolidation services it provided.[6] The

---

Sess. 4 (1949); *Miscellaneous Amendments to Interstate Commerce Act (Omnibus Bill): Hearings Before a Subcomm. of the Senate Comm. on Interstate Commerce*, 80th Cong., 2d Sess. 11–12 (1948).

**5.** *House Hearings, supra*, note 4, at 4.

**6.** Bos-Taun could arguably be liable for full value on an overcharge theory. Since there were no tariffs filed to reflect Bos-Taun's consolidation charges, the amount of the overcharge, i. e., the amount "in excess of" filed tariffs, § 304a(6), technically may be the entire charge. But it would make little sense to concede, under *DeMario*, that a court has the historic power of equity to provide complete relief in light of the statutory purposes, and yet limit that court to the extreme sanction of ordering refunds of all charges collected. We hold that the court has the full range of power to determine what overcharge remedy, if any, is appropriate.

In this case, since no tariffs were on file, and since, therefore, Bos-Taun's charges were in excess of rates applicable under any tariffs, we think in terms of overcharge. *See* note 3, *supra*. Should the court, in exercising its equitable powers, decide to allow Bos-Taun to retain a reasonable charge, however, we think that what would be a reasonable charge must first be decided by the I.C.C. Note 8, *infra*. A somewhat different case would be presented were the I.C.C. to seek restitution of charges, which though not in excess of filed tariffs, were deemed unreasonable. Were a court, in carrying out its equitable powers in response to prayers for injunctive relief under 49 U.S.C. § 322(b)(1), to order such restitution, this would be tantamount to the remedy of repara-

court may also need to inquire to what extent full recovery of overcharges might provide a windfall for aggrieved shippers and impose a penalty on defendants;[7] to what extent the degree of defendants' fault should bear on a restitution award against them; or to what extent the court's approach to the question of equitable restitution should resemble what a court might do in awarding damages directly to a shipper in a § 304a action. The district court may well find other issues, also, that it deems relevant to the proper exercise of its equitable power. Needless to say, since the terrain is not clearly charted, the court will need the help of the parties who should present a comprehensive case on all these issues.

Of course, before reaching these issues the district court first must consider defendants' motion to dismiss on the grounds that the complaint fails to state a claim and that the court lacks jurisdiction over Bos-Taun since it is not engaged in interstate commerce. We do not agree with the district court that these issues, i. e., whether Bos-Taun's relationship with B & T is close enough to bring Bos-Taun under the regulatory mantle of the I.C.C., fall within the I.C.C.'s primary jurisdiction, even though they may involve factual questions for which expert consideration would be helpful. "[W]hen [an] agency chooses to go to the district court for enforcement, it makes little sense to refer the very question at issue to the agency." *C. A. B. v. Aeromatic Travel Corp.*, 489 F.2d 251, 254 (2d Cir. 1974). Accordingly, the doctrine of primary jurisdiction does not apply here, since the agency itself is the plaintiff. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 419 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977); *I. C. C. v. All-American, Inc.*, 505 F.2d 1360, 1362–63 (7th Cir. 1974); *I. C. C. v. Maine Central R. R. Co.*, 505 F.2d 590, 594 (2d Cir. 1974); *C. A. B., supra*, at 254. This is particularly so because the I.C.C.'s position on this matter is clear, and because the benefits of reference to the I.C.C. in this case probably would not justify the accompanying delay. *See Mississippi Power & Light Co., supra*, at 419. The district court instead should decide for itself whether Bos-Taun and B & T should be found to have operated as a single transportation enterprise. In so deciding the court will have available to it the I.C.C.'s views concerning the dictates of uniform transportation policy, to which the court may give such weight as it deems appropriate.[8]

---

tions granted shippers under 49 U.S.C. § 304a(5). *See* note 3, *supra*.

The I.C.C. plays a dominant administrative role in applying this statutory remedy, since it must determine the level of reasonable charges. Note 8, *infra*. In what we might call the equitable analogue of reparations, i. e., a suit in which the I.C.C. seeks equitable restitution of unreasonable charges, a court would have to determine whether the dominant administrative role played by the I.C.C. in determining reasonable charges foreclosed recognition of the equitable remedy or whether there remained such room for equity doctrine, such as laches and clean hands, as to allow an equity court to include the remedy in its tool box. A court might also wish to consider whether *T. I. M. E. Inc. v. United States*, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), was relevant to the authority of the I.C.C. to request an equitable order having the effect of reparations. While symmetry suggests allowing a court, in the exercise of full equitable powers under *De-Mario*, the same scope whether or not tariffs have been filed, this case is not before us and the issues have not been briefed.

7. *Compare DeMario, supra*, 361 U.S. at 293, 80 S.Ct. 332 (restitution of lost wages not punitive).

8. If the court on remand finds that Bos-Taun must provide restitution but is entitled to retain a reasonable charge, then, despite the I.C.C.'s presence as plaintiff, the court would need to refer to the I.C.C. the issue of what rate for Bos-Taun's services was "reasonable". It is well-settled that the reasonableness of rates is a matter squarely within the primary jurisdiction of the I. C. C. *T. I. M. E. Inc. v. United States*, 359 U.S. 464, 472, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959); *Texas & Pacific R. R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 440–44, 27 S.Ct. 350, 51 L.Ed. 553 (1907). Expert determination of what constitutes a reasonable rate is not merely helpful, but essential. Furthermore, this issue is a subsidiary one on which the I.C.C. cannot be said to have expressed itself by virtue of its initial decision to bring this enforcement action.

*The order denying injunctive relief is affirmed; the order granting summary judgment for defendants is vacated and the case is remanded for further proceedings not inconsistent with this opinion.*