October 31, 1995 United States Court of Appeals
For the First Circuit


No. 94-2286

COMMONWEALTH OF MASSACHUSETTS,
Plaintiff, Appellee,

v.

BLACKSTONE VALLEY ELECTRIC COMPANY,
Defendant, Appellant.

ERRATA SHEET

The opinion of the Court issued October 6, 1995, is amended
as follows:

On page 28, line 23 Substitute "action" for "rulemaking".

October 11, 1995
United States Court of Appeals
For the First Circuit


No. 94-2286
COMMONWEALTH OF MASSACHUSETTS,
Plaintiff, Appellee,

v.

BLACKSTONE VALLEY ELECTRIC COMPANY,
Defendant, Appellant.



ERRATA SHEET ERRATA SHEET

The opinion of this Court issued on October 6, 1995 is corrected
as follows:

On the cover sheet, line 10: substitute "Joseph L. Tauro" for
"Joseph P. Tauro"; and

On page 14, line 8: substitute "plain meaning" for "law".

United States Court of Appeals
For the First Circuit


No. 94-2286
COMMONWEALTH OF MASSACHUSETTS,
Plaintiff, Appellee,

v.

BLACKSTONE VALLEY ELECTRIC COMPANY,
Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph P. Tauro, U.S. District Judge] 



Before

Cyr, Boudin, and Lynch, Circuit Judges. 



John Voorhees, with whom David F. Goossen, Isaacson, Rosenbaum, 
Woods & Levy, P.C., David A. Fazzone, P.C., and McDermott, Will & 
Emery were on brief, for appellant. 
Karen McGuire, Assistant Attorney General of Massachusetts, with 
whom Scott Harshbarger, Attorney General of Massachusetts was on 
brief, for appellee.
Catherine Adams Fiske, Attorney, United States Department of 
Justice, with whom Lois J. Schiffer, Assistant Attorney General, Anne 
S. Almy and Albert M. Ferlo, Jr., Attorneys, United States Department 
of Justice, and Thomas H. Beisswenger, United States Environmental 
Protection Agency were on brief, for the United States as amicus
curiae.



October 6, 1995


LYNCH, Circuit Judge. The Commonwealth of LYNCH, Circuit Judge. 

Massachusetts seeks to recover response costs under CERCLA

and Mass. Gen. L. ch. 21E from Blackstone Valley Electric Co.

("BVE") for the removal of ferric ferrocyanide ("FFC") from a

waste site in North Attleboro, Massachusetts. The

Commonwealth's ability to recover its response costs, said to

be $5.8 million, turns largely on the question of whether FFC

is a "hazardous substance" within the meaning of CERCLA. The

broader concern raised by this case is identifying who should

decide that question and by what process. We hold that

neither CERCLA nor the existing EPA regulations clearly

establish whether FFC is a hazardous substance, and that the

district court erred in trying to resolve the question on the

Commonwealth's motion for summary judgment, in the face of

warring expert affidavits, where there is no textual plain

meaning to resolve the issue. Invoking the doctrine of

primary jurisdiction, we hold that the EPA should, as

Congress intended, address the question in the first

instance. Accordingly, we vacate the grant of partial

summary judgment and order referral to the EPA for an

administrative determination. In so doing we reject the

EPA's argument as amicus curiae in this court that it has

effectively answered the question of whether FFC is a CERCLA

"hazardous substance" by adopting standard testing protocols

-4-

for effluent discharge regulations promulgated under the

Clean Water Act.

I. Factual Background 

Like many other environmental cases, the story of

this case starts in the last century. Before the

construction of the natural gas pipeline system, gas for

consumer use in heating, lighting, and cooking was often

manufactured from coal at localized facilities. According to

one 1985 study commissioned by the EPA, there were some 1500

such manufactured gas plants in operation throughout this

country between 1889 and 1950. The cleanup of the waste

byproducts of the manufacturing process, which often were

buried on site or deposited in landfills, has been a source

of modern environmental litigation. See, e.g., John Boyd Co. 

v. Boston Gas Co., 1992 WL 212231, *1 (D. Mass. Aug. 18, 

1992), aff'd, 992 F.2d 401, 403-04 (1st Cir. 1993); 

Interstate Power Co. v. Kansas City Power & Light Co., 992 

F.2d 804, 805-06 (8th Cir. 1993).

An important step in the gas manufacturing process

was the purification of the gas obtained from the coal. One

typical purification method involved pumping the untreated

gas through "purifier boxes" containing wood chips coated

with iron oxide. As the untreated gas passed through the

boxes, it reacted chemically with the coated wood chips,

-5-

causing unwanted substances to be filtered out. The

byproducts of the purifying chemical reactions would build up

on the wood chips. One such byproduct was a blue substance

called ferric ferrocyanide (more commonly, Prussian Blue).

Eventually, the spent wood chips still bearing the

byproducts of the chemical purification process would

typically be incinerated or buried.

In the early 1980's, blue-colored wood chips and soil

were discovered in a landfill near a residential area in

North Attleboro, Massachusetts. Between July 1984 and May

1986, the Massachusetts Department of Environmental

Protection ("DEP") excavated the site to remove the blue soil

and wood chips. The blue substance on the wood chips was

identified as ferric ferrocyanide, and the wood chips were

identified as "purifier box waste" from the coal gasification

process. The DEP determined that the FFC-coated chips at the

site had been transported there from a gas facility that had

been operated by BVE's direct corporate predecessor in Rhode

Island from 1920-1961. The Commonwealth subsequently sued

BVE as a generator of the FFC to recover its cleanup costs,

pursuant to the relevant provisions of CERCLA and the

analogous Massachusetts state statutes.1

II. The Statutory Framework 

 

1. The only issue presented here is the CERCLA one.

-6-

A. The "Hazardous Substance" List 

CERCLA provides state and federal governmental

authorities with broad power to clean up waste sites, and

then to seek recovery of response costs from responsible

parties. 42 U.S.C. 9604, 9607; see generally Dedham 

Water Co. v. Cumberland Farm Dairy, Inc., 889 F.2d 1146, 1150 

(1st Cir. 1989). One of the predicates to CERCLA liability

is the release or threatened release of a "hazardous

substance" at the site.

A "hazardous substance" is defined in CERCLA, 42

U.S.C. 9601(14), by incorporation of certain lists of

substances, wastes, and pollutants identified in a number of

other environmental statutes, including the Clean Water Act

("CWA"), 33 U.S.C. 1251 et seq.2 CERCLA requires the 

Administrator of the EPA to promulgate and revise regulations

designating as additional "hazardous substances" any

substances which, "when released into the environment may

present substantial danger to the public health or welfare or

the environment . . . ." 42 U.S.C. 9602(a). The EPA has

codified a consolidated list of hazardous substances

 

2. CERCLA's definition of "hazardous substance" also
incorporates the pollutants listed in the Solid Waste
Disposal Act, as amended by the Resource Conservation and
Control Act, 42 U.S.C. 6921 et seq., the Clean Air Act, 42 
U.S.C. 7401 et seq., and the Toxic Substances Control Act, 
15 U.S.C. 2601 et seq. The parties agree that only the CWA 
list is pertinent here.

-7-

subsuming all of the statutory lists incorporated by CERCLA,

at 40 C.F.R. 302.4, Table 302.4 ("Table 302.4").3

The substance FFC is not specifically named in any of

the statutory lists of substances incorporated by CERCLA and

hence does not appear in Table 302.4. The EPA has never

taken official action pursuant to its authority under 42

U.S.C. 9602(a) specifically to add FFC to the CERCLA

hazardous substance list. Table 302.4 does list, however, a

broad category of compounds "cyanides" which, in turn,

the Commonwealth claims, does encompass FFC. 

B. "Cyanides" 

The category "cyanides" in Table 302.4 has its

origins in the CWA. The EPA was required to promulgate,

within a short period following the CWA's enactment, a list

of "any toxic pollutant or combination of such pollutants" to

be subject to regulation under the statute. See CWA, Pub. L. 

No. 92-500, 307(a)(1), 86 Stat. 816, 856, 1972 U.S.C.C.A.N.

951, 1000. Pursuant to this directive, an ad hoc EPA work 

group developed a proposed list of 65 toxic pollutants.

After public notice and comment, this list (the "CWA list")

was adopted by Congress, see 33 U.S.C. 1317(a), published 

 

3. The Massachusetts analogue to CERCLA defines "hazardous
material" to include all "hazardous substances" under CERCLA. 
See Mass. Gen. L. ch. 21E, 2. 

-8-

by the EPA, see 43 Fed. Reg. 4108-09 (Jan. 31, 1978), and 

codified, see 40 C.F.R. 401.15. 

In addition to identifying various specific, discrete

chemical compounds (e.g., "benzene," "2,4-dichlorophenol"), 

the CWA list also identifies several groups of compounds

associated with particular elements (e.g., "arsenic and 

compounds," "zinc and compounds"), and classes of more

generally denominated compounds (e.g., "nitrosamines," 

"chlorinated ethanes"). One of the latter such classes of

compounds on the list is "cyanides." The dispute in this

case has centered on whether the term "cyanides" in the CWA

list (and incorporated into Table 302.4) includes FFC,

thereby bringing FFC within the scope of CERCLA's definition

of "hazardous substance."

III. Proceedings in the District Court 

After discovery, the Commonwealth moved for partial

summary judgment as to liability against BVE, claiming that,

as a matter of law, FFC is a "hazardous substance" within the

meaning of CERCLA. The Commonwealth argued FFC falls within

the "plain meaning" of the term "cyanides" in Table 302.4.4

 

4. To avoid confusion, we observe that neither party
attaches controlling significance to the fact that the common
name of the substance at issue ferric ferrocyanide  
contains the word "cyanide." In fact, according to modern
chemical nomenclature conventions, the proper name for FFC is
"iron(III) hexacyanoferrate(II)." The appearance of the word
"cyanide" within the name "ferric ferrocyanide" does not
factor into the interpretation.

-9-

After a hearing on the Commonwealth's motion, the

district court directed the parties to "focus only on the

meaning of the term ['cyanides'] as it is understood in the

general scientific community." Commonwealth of Mass. v. BVE, 

Civ. No. 87-1799-T, Memorandum at 5 (D. Mass. May 23, 1990).

Accordingly, BVE filed expert affidavits attesting that the

plain meaning of "cyanides" does not include the substance 

FFC, and the Commonwealth filed expert affidavits attesting

that it does.

Additionally, the Commonwealth attempted to solicit

the EPA's involvement in the case. Before filing its motion,

the Commonwealth had asked the EPA to participate in the case

as amicus curiae, but the EPA had refused. After the summary

judgment hearing, the Commonwealth asked the EPA to provide

an affidavit stating that the EPA's own definition of

"cyanides" encompasses FFC. The EPA again declined the

Commonwealth's invitation. Instead, the EPA wrote a letter

to the Massachusetts Attorney General's office, signed by

Stephen D. Luftig, the Director of EPA's Emergency Response

Division (the "Luftig Letter"). The letter purported to

describe the EPA's administrative view of the status of FFC

vis- -vis the CERCLA/CWA category of "cyanides." The

Commonwealth provided this letter to the district court as

additional support for its motion.

-10-

The district court granted the Commonwealth's motion

for partial summary judgment. Commonwealth of Massachusetts 

v. Blackstone Valley Electric Co., 777 F. Supp. 1036 (D. 

Mass. 1991). The district court made no mention of the

Luftig Letter in its decision. It relied instead upon two

sentences of text concerning chemical testing procedures for

cyanides contained in a reference publication called

"Standard Methods." See American Public Health Ass'n et al., 

Standard Methods for the Examination of Water and Wastewater 

(18th ed. 1992). One of the Commonwealth's experts had

averred that Standard Methods is a "'universally accepted 

environmental chemistry lab testing manual in the general

scientific community.'" 777 F. Supp. at 1038 n.3 (quoting

expert affidavit). Based on its reading of that

publication,5 the district court concluded that FFC was

properly classified as a "complex cyanide," that "[t]he plain

meaning of cyanides includes complexes such as ferric

ferrocyanide," and that FFC was therefore a hazardous

substance within the meaning of CERCLA. Id. at 1039. The 

 

5. The district court focused on the following paragraph:

Cyanide refers to all of the CN groups in cyanide
compounds that can be determined as the cyanide ion,
CN-, by the methods used. The cyanide compounds in
which cyanide can be obtained as CN- are classed as
simple and complex cyanides.

777 F. Supp. at 1038 (quoting Standard Methods, supra, at 4- 
18).

-11-

district court rejected BVE's arguments and expert affidavits

supporting a contrary result and added: "Blackstone's

argument, essentially, is that FFC should not be on the list.

This is a contention that Blackstone should present to the

EPA, not to this court." Id.6 

We disagree with the district court's conclusions

about the "plain meaning" of "cyanides." We have

considerable sympathy, however, for its sentiment that BVE's

arguments about the status of FFC are best suited for

presentation to the EPA.

IV. Discussion 

We review the district court's summary judgment order

de novo. See Vasapolli v. Rostoff, 39 F.3d 27, 32 (1st Cir. 

1994). Our review of the district court's interpretation of

the relevant statutory framework also is plenary. See Estey 

v. Commissioner, Maine Dep't of Human Services, 21 F.3d 1198, 

1201 (1st Cir. 1994). In assessing whether the Commonwealth

is entitled to judgment as a matter of law, we must regard

the record and draw all inferences in a manner favorable to

BVE. Only if, viewed in that light, the record discloses no

 

6. Later, based in part on its grant of partial summary
judgment against BVE on the FFC issue, the court entered
summary judgment in favor of the Commonwealth on the issue of
BVE's liability as a generator under CERCLA, 42 U.S.C.
9607(a)(3). See Commonwealth of Mass. v. Blackstone Valley 
Electric Co., 808 F. Supp. 912, 914-16 (D. Mass. 1992). BVE 
has not appealed from the latter order.

-12-

genuine issue of material fact will we uphold the grant of

summary judgment. FDIC v. Bay Street Dev. Co., 32 F.3d 636, 

639 (1st Cir. 1994).

A. Absence of Plain Meaning 

The Commonwealth and BVE both argued to the district

court that the term "cyanides" has a "plain meaning," but

were sharply at odds as to whether that meaning encompasses

FFC. The district court endorsed the plain meaning approach,

see 777 F. Supp. at 1038, and agreed with the Commonwealth 

that the plain meaning of "cyanides" includes FFC. Id. at 

1039. We find that the district court's reliance on the

plain meaning approach was misplaced on the facts here.

Of course when the words of a statutory provision are

clear, the provision's plain meaning must govern its

application, unless a palpably unreasonable outcome would

result. See, e.g., Hogan v. Bangor & Aroostook Railroad Co., 

61 F.3d 1034, 1037 (1st Cir. 1995); Pritzker v. Yari, 42 F.3d 

53, 67-68 (1st Cir. 1994). Yet, as the qualifications that

are a part of the plain meaning rule suggest, that rule does

not provide a panacea for every problem of statutory

construction. Words can be ambiguous, often materially so.

See Greenwood Trust Co. v. Commonwealth of Mass., 971 F.2d 

818, 825 (1st Cir. 1992) ("[T]he plain-meaning doctrine is

not a pedagogical absolute."), cert. denied, 113 S. Ct. 974 

(1993). When ambiguity is identified, a dispute about a

-13-

statute's or regulation's proper construction cannot be

resolved simply by placing the gloss of "plain meaning" on

one competing interpretation. See, e.g., In re Jarvis, 53 

F.3d 416, 419 (1st Cir. 1995) (finding plain meaning inquiry

inapposite where relevant language was indeterminate); United 

States v. O'Neil, 11 F.3d 292, 294-96 (1st Cir. 1993) (same, 

where term "revoke" was ambiguous in relevant context); Isaac 

v. Harvard Univ., 769 F.2d 817, 820 (1st Cir. 1985) (same, 

where terms "proceedings" and "terminated" were ambiguous as

used); cf. Allen v. Adage, Inc., 967 F.2d 695, 700 (1st Cir. 

1992) (finding term "reduction-in-force" to be ambiguous and

therefore "unplain" in context of an ERISA plan).

Here, both BVE and the Commonwealth argue that the

plain meaning of "cyanides" can be ascertained by consulting

"the scientific community." To this end, they have filled

the record with competing expert affidavits setting forth

contradictory views (each ostensibly authoritative) as to

whether FFC is a member of the category "cyanides."

But no "plain" meaning of the term "cyanides" can be

identified from among these conflicting expert affidavits.

It is true that, as a general rule of construction, when a

statute contains "technical words or terms of art, 'it [is]

proper to explain them by reference to the art or science to

which they [are] appropriate.'" Corning Glass Works v. 

Brennan, 417 U.S. 188, 201 (1974) (bracketed alterations in 

-14-

original) (quoting Greenleaf v. Goodrich, 101 U.S. 278, 284 

(1880)).

Assuming that the "scientific community" is the

appropriate body by reference to which the meaning of

"cyanides" should be determined, the basic indeterminacy

nonetheless remains. The "scientific community" is not a

monolithic entity that has spoken here in a single

authoritative voice. As one of BVE's experts stated, members

of different disciplines within the scientific community at

large are apt to take sharply contrasting approaches and to

give conflicting answers to the question whether FFC can

properly be classified as one of the "cyanides." Thus, the

Commonwealth's key expert, an analytical chemist, states

confidently that "[t]here can be no dispute . . . that

cyanides and all other chemical substances are defined based 

on chemical reactivity [emphasis added]," and thus

understands "cyanides" to include "all those chemical

compounds containing the negatively charged cyanide ion, CN-"

and that "can yield the free cyanide ion" in laboratory 

conditions. Then, stating that "there is no doubt that the

CN moiety in iron cyanide complexes is uni-negative" and that

FFC does release the free cyanide ion when boiled in

concentrated sulfuric acid, he concludes that FFC is properly

categorized as one of the "cyanides." On the other hand,

BVE's expert (who was one of the consultants to the EPA who

-15-

helped devise the CWA list) asserts just as confidently that

most scientists other than analytical chemists "would define

'cyanides' as substances that are toxic due to the CN group."

Stating that FFC is not toxic and does not release

"toxicologically significant doses of [free] cyanide under

environmental conditions [emphasis added]," BVE's expert 

concludes that FFC is not properly classified as one of the

"cyanides" within the meaning of CERCLA.

The term "cyanides" as it appears in Table 302.4 is,

we believe, ambiguous in the context of this case. The term

suffers from an ambiguity that might be classified as a

"categorical indeterminacy." See Clark D. Cunningham et al., 

Plain Meaning and Hard Cases, 103 Yale L.J. 1561, 1585 (1994) 

(reviewing Lawrence M. Solan, The Language of Judges (1993)). 

At least on the record before us, the category "cyanides"

does not admit of crisply defined boundaries, and resolution

of the disagreement about whether FFC falls within those

fuzzy boundaries requires a value-laden choice from among

competing interpretive assumptions, a choice that cannot be

made through mere inspection of the term's normal or ordinary

usage.

Mindful that we must view the record in the light

most favorable to BVE, this indeterminacy cannot be resolved

by designating the Commonwealth's rendition of the meaning of

"cyanides" as "plain." From the viewpoint of a federal court

-16-

presented with facially credible expert affidavits that

directly contradict each other on the issue, the question

whether "cyanides" in Table 302.4 encompasses FFC for

purposes of CERCLA liability cannot be answered as a matter

of law.7

B. Legislative and Regulatory History 

Having found considerable ambiguity in the word

"cyanides," we turn to whether the history of the CWA

provides a clearer understanding. The legislative history of

the statute contains no express congressional guidance as to

the scope of the term. The regulatory history of the CWA

toxic pollutant list, however, does provide substantial

reason for skepticism about the Commonwealth's and the EPA's

claim that "cyanides" encompasses FFC.

The list of substances and classes of substances

currently codified at 40 C.F.R. 401.15 (and incorporated

into Table 302.4) was developed by the EPA pursuant to

Congress' directive to produce a list of toxic pollutants to

be subject to regulation under the CWA. See CWA, Pub. L. No. 

92-500, 307(a)(1), 86 Stat. 816, 1972 U.S.C.C.A.N. 951,

1000. Congress defined "toxic pollutants" as those

"pollutants, or combination of pollutants" that were believed

 

7. We also note that the EPA has not argued in its amicus
brief that the plain meaning of cyanides in Table 302.4
includes FFC.

-17-

to "cause death, disease, behavioral abnormalities, cancer,

genetic mutations, physiological malfunctions (including

malfunctions in reproduction) or physical deformations" in

organisms or their offspring. 33 U.S.C. 1362(13).

Congress expressly instructed the EPA in devising the list to

"take into account the toxicity of the pollutant, its

persistence, degradability, the usual or potential presence

of the affected organisms in any waters, the importance of

the affected organisms and the nature and extent of the

effect of the toxic pollutant on such organisms." CWA,

supra, 307(a)(1), 86 Stat. at 856, 1972 U.S.C.C.A.N. at 

1000.

After public notice and an initial period for public

comment, the EPA published a proposed list of toxic

pollutants for regulation under the CWA. 38 Fed. Reg. 24342

(Sep. 7, 1973). This original proposed list did not include

the category "cyanides." Instead, it listed "cyanide and all

cyanide compounds." 38 Fed. Reg. at 24344. The EPA

commentary accompanying the proposed list noted that

"[c]yanide is on the list because of its high order of

toxicity to aquatic life." Id. The text then acknowledged 

that some commentators had "objected to inclusion of 'all

cyanide compounds'" and had "argued that only compounds which

dissociate in water to form toxic concentrations of cyanide

ion or hydrogen cyanide should be included." Id. Thus, 

-18-

there was some public concern that the listing of "all

cyanide compounds" was overinclusive, and that only a subset

of "cyanide compounds" compounds which, in environmental

conditions would produce toxic results should be included

on the CWA list. The EPA's commentary stated that the

"proposed effluent standards will take these comments into 

account . . . ." Id. (emphasis added). On the final CWA 

list of toxic pollutants (as adopted by Congress), the

category "cyanide and all cyanide compounds" was replaced

with the category "cyanides." See 40 C.F.R. 401.15. 

Viewed in the light most favorable to BVE, the

evidence indicates that FFC is highly stable, insoluble in

water, and completely non-toxic to human and aquatic life.

Against the backdrop of (1) the definition of "toxic

pollutant" contained in the CWA; (2) the congressional

directive that required the EPA to "take into account the

toxicity" of pollutants in producing the CWA list; (3) the

EPA's own comment that "cyanide is on the list because of its

high order of toxicity"; and (4) the objections that appear

to have precipitated the change from "cyanide and all cyanide

compounds" to "cyanides", there would seem substantial reason

to doubt that FFC, claimed to be a non-toxic substance, could

properly be deemed to fall within the category "cyanides."

The history of the CWA list tends to support BVE's claim that

-19-

the category "cyanides" was never contemplated to encompass

substances such as FFC for purposes of the CWA or CERCLA.

This leaves the question of whether the EPA has

adopted elsewhere an official agency interpretation that

clearly includes or excludes FFC as a CERCLA hazardous

substance. We find that no such agency interpretation has

been established.

C. Absence of A Regulatory Definition 

In its amicus brief, the EPA distances itself from

the parties' and district court's "law" approach. It argues

that the initial decision whether FFC is a "hazardous

substance" is one that must be left to the EPA. We agree.

It further argues, however, that although no

definition of "cyanides" can be found in the regulations

identifying CERCLA hazardous substances, it is spelled out

elsewhere in the applicable regulatory framework, and that it

encompasses FFC. On this score, we are not persuaded, for a

number of reasons. The regulatory text itself does not

support the argument; the argument leads to results which are

overbroad and defy common sense; the EPA has itself taken

inconsistent positions; the position is articulated solely

and for the first time in a litigation posture; and policy

reasons dictate against the approach proposed by the EPA.

1. Absence of Rules Specifically Concerning FFC 

-20-

The EPA has clearly not acted pursuant to its

authority under CERCLA, 42 U.S.C. 9602(a), nor under the

CWA, 33 U.S.C. 1317(a)(1), to promulgate a rule

specifically listing FFC as a "hazardous substance" (CERCLA)

or a "toxic pollutant" (CWA). Neither the Commonwealth nor

amicus contends otherwise. The EPA has also never issued a

rule specifically for the purpose of defining the scope of

the term "cyanides." The EPA has in the past resorted to its

rulemaking authority to provide clear guidance to the public

as to the scope of at least six other substances or classes 

of substances listed as CWA toxic pollutants, see 40 C.F.R. 

129.4, but it never has done so with respect to the term

"cyanides." Indeed, the Luftig Letter submitted by the

Commonwealth to the district court acknowledges that "[t]he

term 'cyanides' is not specifically defined in the CWA or, as

far as we can determine, in the legislative history . . . ."

2. The "Total Cyanide" Test 

The EPA's central focus in its amicus brief is on

certain regulations establishing a testing protocol for the

analysis of cyanide in effluent discharges under the CWA.

The EPA contends that this test procedure provides the legal

definition of "cyanides," and that FFC falls within this

definition. We conclude that this contention is not

supported by the relevant regulatory framework, and that the

-21-

testing protocol referred to cannot properly be interpreted

to provide the definition of "cyanides" under CERCLA.

Independent of its authority to designate hazardous

substances and toxic pollutants under CERCLA and the CWA, the

EPA also has authority and responsibility under the CWA to

"promulgate guidelines establishing test procedures for the

analysis of pollutants that shall include the factors which

must be provided in any [CWA compliance certification or

permit application]." 33 U.S.C. 1314(h). Pursuant to this

delegation, the EPA has issued regulations incorporating test

procedures for measuring the level of certain "parameters" in

a water or waste sample. See 40 C.F.R. 136.3. One of the 

listed parameters is "cyanide-total, mg/L." Id. The 

regulation indicates that the procedures to be used in

measuring "cyanide-total" in effluent discharges are those

described in the Standard Methods reference publication. 

Amicus places overriding significance upon one of these 

procedures, called the "total cyanide" test. See Standard 

Methods, supra, at 4-20, 4-23. This procedure involves 

boiling the sample to be tested in concentrated sulfuric

acid. Compounds that contain the CN group in their chemical

composition, it is said, will release detectable amounts of

free cyanide when subjected to the procedure.

Amicus claims that, under the EPA's regulations, any

substance that releases cyanide upon being boiled in sulfuric

-22-

acid under the "total cyanide" test qualifies as one of the

"cyanides" for purposes of CERCLA liability. It further

claims that because FFC releases some cyanide when subjected

to the "total cyanide" test, it is necessarily one of the

"cyanides" within the meaning of CERCLA. We do not think

that this conclusion follows.

The EPA's own regulations do not use the test

procedures identified at 40 C.F.R. 136.3 (including the

Standard Methods protocol) to define the scope of CWA- or 

CERCLA-designated categories of toxic pollutants or hazardous

substances. The regulations never state that any substance

that releases cyanide under the "total cyanide" test

qualifies as one of the "cyanides" for purposes of CERCLA.

Rather, the regulations themselves say something quite

different. The regulation that specifically governs the

applicability of the identified test procedures states that

the procedures are intended to "perform the measurements" 

required in connection with (a) Clean Water Act permit

applications, (b) discharge reports, and (c) certain

compliance certifications issued by states. 40 C.F.R.

136.1 (emphasis added). None of these three expressly

designated uses for the test procedures is applicable here,

and none has anything to do with providing a definition of 

any class of pollutants. The regulations intend the "total

cyanide" procedure to serve only the purpose of measuring the

-23-

total CN8 by weight in the chemical composition of a given

waste sample, not to define which chemical substances count

as a member of the category "cyanides." Thus, even if FFC

can be measured for "total cyanide" composition under the 

Standard Methods procedure,9 it surely does not follow as a 

matter of law or logic that FFC is one of the "cyanides" for

purposes of CERCLA liability.

A further difficulty with amicus' attempt to define

"cyanides" by reference to the total cyanide test is that

such a definition may lead to nonsensical results. One of

BVE's experts observes that there are many everyday

substances that contain the CN group in their chemical

composition (e.g., vitamin B-12, the synthetic fiber Orlon, 

and a number of common medicines such as Lomotil), and some

or all of these substances, like FFC, would also release

cyanide when subjected to the conditions of the total cyanide

test.10 Yet no one, including the EPA, would categorize

 

8. "CN" is the chemical formula of the cyanide molecule.

9. BVE's expert asserts that because of the properties of
FFC, the total cyanide test cannot actually give an accurate 
quantification of the total CN composition by weight in a
given sample of FFC. The Commonwealth's expert appears to
agree on this point, but states that because FFC does
nevertheless yield some cyanide when subjected to the 
procedure, FFC is one of the "cyanides."

10. The Commonwealth's expert appears to deny that vitamin
B-12 would release cyanide in a total cyanide test. For
purposes of deciding the Commonwealth's summary judgment
motion, we credit BVE's position on this factual issue, as we
must. The EPA in its amicus brief does not attempt to

-24-

vitamin B-12, for example, as one of the "cyanides" within

the meaning of the CWA or CERCLA. BVE's experts have averred

that FFC's chemical structure and composition are much more

similar to substances like vitamin B-12 than to toxic

substances like potassium cyanide. Assuming BVE is correct,

as we must here, a rule that defined "cyanides" to include

all substances that release any cyanide when subjected to the 

total cyanide test would appear to be untenably

overinclusive.11

The unsettled nature of the status of FFC vis- -vis

the category "cyanides" is further demonstrated by at least

one documented situation in which the EPA has appeared to

take official action at odds with the position articulated in

its amicus brief. This situation, discussed in some detail

in the Luftig Letter submitted to the district court,

involved the EPA's handling in 1985 of ferrocyanide wastes

generated at a facility operated by the Mearl corporation.

Mearl had filed a petition before the EPA to exclude its

wastewater treatment sludge from regulation under RCRA. See 

 

dispute BVE's factual assertion.

11. Indeed, the problem of overbreadth is what appears to
have prompted commentators to object to the EPA's original
inclusion of "cyanide and all cyanide compounds" on the
proposed CWA list, and what prompted the change to
"cyanides." See 38 Fed. Reg. at 24344. Yet, using the 
"total cyanide" test to define "cyanides" as amicus proposes
would, in effect, make the category "cyanides" equivalent to
the rejected formulation, "all cyanide compounds."

-25-

50 Fed. Reg. 7882, 7888-90 (Feb. 26, 1985). Although a test

for total cyanide indicated positive results, Mearl argued to

the EPA that all cyanide in the waste was "in the insoluble,

non-toxic form of ferric ferrocyanide." 50 Fed. Reg. at

7889. After public hearing and comment, the EPA granted

Mearl's petition to exclude the waste from RCRA regulation,

stating that "the waste does not exhibit any of the

characteristics of hazardous waste." 50 Fed. Reg. 48886,

48890 (Nov. 27, 1985). The EPA further stated that "the

cyanide present [in the sludge, in the form of FFC] will not

convert to free cyanide [in environmental conditions] and

therefore is not of regulatory concern with respect to 

ground-water or atmospheric exposure routes." 50 Fed. Reg.

at 48890 (emphasis added).

While technically, the decision to exclude Mearl's

wastewater sludge from RCRA regulation was limited to Mearl's

own facility, and did not directly affect the status of FFC

under the CWA or CERCLA, it is difficult to ignore the EPA's

statement that the FFC in the Mearl sludge was "not of

regulatory concern" because it would not convert to free

cyanide under environmental conditions. Here, too, the

record supports the conclusion that the FFC found at the

Attleboro site may pose no threat of releasing free cyanide

-26-

under normal environmental conditions.12 At a minimum, the

EPA's action with respect to the Mearl petition provides some

support for BVE's position in this litigation.

We conclude that the EPA rules promulgated under the

CWA that identify test procedures for the measurement of

wastewater parameters, including the total cyanide test, do

not set forth an agency definition of "cyanides" for purposes

of the CWA's list of toxic pollutants or CERCLA's list of

hazardous substances. Thus, even assuming that FFC releases

cyanide when subjected to the Standard Methods test for 

measuring "total cyanide," it does not follow as a matter of

law that FFC is one of the "cyanides" for purposes of CERCLA

liability.

3. Agency Deference 

The varying positions stated in the EPA's amicus

brief and in the Luftig Letter concerning the EPA's purported

 

12. The Commonwealth's experts (and its counsel at oral
argument) have suggested that FFC could degrade and release
cyanide gas when exposed to sunlight. BVE's expert has
attested to a directly contrary conclusion. Additionally,
the Commonwealth's counsel asserted at oral argument that
some free cyanide was found at the Attleboro site, suggesting 
that the cyanide had dissociated from the FFC under
environmental conditions. However, as far as the record
discloses, only trace amounts of free cyanide were found at
the site, i.e., measuring less than 1 part per million. By 
comparison, the generally recognized safety threshold for
free cyanide in workroom air is 10 parts per million. For
purposes of evaluating the Commonwealth's summary judgment
motion, we must assume that FFC does not degrade when exposed
to sunlight, and that no more than background levels of free
cyanide were detectable at the Attleboro waste site.

-27-

definition of "cyanides" are not entitled to deference under

the principles of Chevron U.S.A., Inc. v. Natural Resources 

Defense Council, Inc., 467 U.S. 837 (1984). It is apparent 

that the argument for defining "cyanides" by reference to the

total cyanide test has been tailored to and articulated

specifically for purposes of this particular litigation.13

As such, that position need not be given any special weight.

See Martin v. Occupational Safety & Health Rev. Comm'n, 499 

U.S. 144, 156-57 (1991) (agency's litigating position, in the

nature of "post hoc rationalization" rather than the result

of the official exercise of action authority, is entitled to

no Chevron deference); see also Director, Office of Workers' 

Compensation Programs, U.S. Dep't of Labor v. General 

Dynamics Corp., 980 F.2d 74, 79 (1st Cir. 1992); Brewster v. 

Sullivan, 972 F.2d 898, 901 (8th Cir. 1992). 

4. Policy Considerations 

 

13. The Luftig Letter, while written by an EPA official,
does not set forth an entrenched EPA view. The letter does
not articulate a definition as such of the term "cyanides"
and is tellingly circumspect in its discussion of the EPA's
purported position on whether FFC falls within that category. 
Instead of stating outright that the EPA adheres to an
established definition of "cyanides" that encompasses FFC, it
makes only the far weaker statement that "the manner in which
EPA addresses cyanides under the Clean Water Act indicates
that the term does include ferric ferrocyanide." 
Furthermore, while the letter says that the EPA uses the
total cyanide test described in Standard Methods, it never 
states that the EPA has defined "cyanides" by reference to 
that test, offering the more limited assertion that
"[t]he[se] testing procedures provide confirmation that 
ferric ferrocyanide is a 'cyanide' [emphasis added]."

-28-

We are also troubled by the EPA's approach here as a

matter of policy. A complicated regulatory regime like

CERCLA or the CWA cannot function effectively unless citizens

are given fair notice of their obligations. Congress

delegated to the EPA the continuing task of defining which

substances are "hazardous substances" to which CERCLA

liability can attach. The EPA does not argue here that the

term "cyanides" has a plain meaning that would enable a

person to answer the question of whether FFC falls within

that category. Instead, it suggests that the patchwork of

regulations relating to the measurement of effluent

discharges can be adapted to the task at hand. We can thus

determine the status of FFC for CERCLA liability purposes,

says the EPA, by boiling the FFC in concentrated sulfuric

acid. Yet the EPA points to no regulation or other source 

except its amicus submission to this court that tells the

public that boiling a substance in concentrated sulfuric acid

is the way to determine whether it legally qualifies as one

of the "cyanides." That is not fair notice to the public and

is not what Congress contemplated when it granted the EPA

power to promulgate regulations to define and supplement

CERCLA's list of hazardous substances.

D. Primary Jurisdiction 

Because there exists no basis for concluding as a

matter of law that FFC falls within the scope of the term

-29-

"cyanides," the district court's order granting partial

summary judgment in favor of the Commonwealth must be

vacated. We are left, then, to decide whether the proper

disposition of this appeal is to remand the case to the

district court for trial, or to prescribe some other avenue

for appropriate factfinding with respect to "cyanides" and

FFC. We conclude that the proper course is a referral to the

EPA under the doctrine of primary jurisdiction.

Having found that the term "cyanides" is ambiguous,

that EPA's regulatory framework does not adequately define

the term, that the legislative and regulatory history of the

term "cyanides" does not establish the Commonwealth's

position, and that the position advocated by amicus is not

entitled to deference, we are left with virtually no

legislative or administrative guidance for determining

whether, on the record before us, FFC is one of the

"cyanides." Congress delegated to the EPA, not to the

courts, the authority to administer the CWA toxic pollutant

list and the CERCLA list of hazardous substances. This case

seems clearly to call for referral to the EPA under the

"primary jurisdiction" doctrine, for an appropriate

administrative determination of whether FFC falls within the

category "cyanides." Cf. Chastain v. AT&T Co., 351 F. Supp. 

1320, 1323 (D.D.C. 1972) (invoking primary jurisdiction

doctrine and referring case to the relevant agency, where the

-30-

court was "unwilling and unable to assume the initial

responsibility of evaluating the highly technical questions

raised by the parties").

The Supreme Court has stated that "[n]o fixed formula

exists for applying the doctrine of primary jurisdiction."

United States v. Western Pacific Railroad Co., 352 U.S. 59, 

64 (1956). Broadly speaking, the doctrine, informed by

principles of deference to agency decisionmaking, gives

effect to the eminently sensible notion that "in cases

raising issues of fact not within the conventional experience

of judges or cases requiring the exercise of administrative

discretion, agencies created by Congress for regulating the

subject matter should not be passed over." Id. (quoting Far 

East Conference v. United States, 342 U.S. 570, 574-75 

(1952)); see generally II Kenneth C. Davis & Richard J. 

Pierce, Jr., Administrative Law Treatise 14.1, at 271-80 

(3d ed. 1994). The doctrine is intended to "serve[] as a

means of coordinating administrative and judicial machinery,"

and to "promote uniformity and take advantage of agencies'

special expertise." Mashpee Tribe v. New Seabury Corp., 592 

F.2d 575, 580 (1st Cir. 1979).

This court has said that there are three factors that

guide the decision whether or not to defer a matter to an

agency under the primary jurisdiction doctrine:

(1) whether the agency determination l[ies]
at the heart of the task assigned the agency

-31-

by Congress; (2) whether agency expertise
[i]s required to unravel intricate, technical
facts; and (3) whether, though perhaps not
determinative, the agency determination would
materially aid the court.

Id. at 580-81 (citing Chicago Mercantile Exchange v. Deaktor, 

414 U.S. 113, 114-15 (1973)). All three of these factors are

plainly satisfied here. The determination whether FFC is a

hazardous substance is specifically within the scope of the

EPA's delegated authority; the EPA's expertise is required to

sift through and properly weigh all of the arguments for and

against including FFC within the category "cyanides"; and

official rulemaking by the EPA on this issue would

indisputably assist the court in determining BVE's liability

to the Commonwealth under CERCLA.14

The judicial machinery is ill-suited to fashioning a

workable rule for determining whether the substance FFC by

virtue of its chemical, structural, functional, or other

qualities, falls within the properly conceived definition of

"cyanides." That determination is much better left to the

EPA.

 

14. We acknowledge the general principle that a primary
jurisdiction reference to an agency is usually inappropriate
in an enforcement action brought by the agency. See ICC v. 
B&T Transp. Co., 613 F.2d 1182, 1187 (1st Cir. 1980) (stating 
that the primary jurisdiction doctrine does not apply where
the agency brings suit, because the agency's position on the
matter to be litigated will be clear). This action, however,
was brought by the Commonwealth, not by the EPA. As noted
above, the EPA's position on the definition of "cyanides" is
far from clear.

-32-

Referral to the EPA under the doctrine of primary

jurisdiction will also serve the interest of national

uniformity in regulation. The question of whether FFC is a

CERCLA hazardous substance is of more than local concern. As

noted earlier, FFC is a common byproduct of the gas

manufacturing process that was prevalent in prior decades at

some 1500 different facilities across the country. Moreover,

a determination as to whether FFC is one of the "cyanides"

would undoubtedly have significant implications beyond our

purview for similar substances whose status under CERCLA

currently remains unclear. Rather than leave this matter to

the risk of inconsistent outcomes before particular courts in

different parts of the country, we believe it better to have

the EPA resolve the issue nationwide.15

Accordingly, we conclude that this case should be

referred to the EPA for an administrative determination of

whether FFC is one of the "cyanides" within the meaning of 40

C.F.R. 401.15 and Table 302.4. We further conclude that

the district court proceedings in this case shall be stayed

and that the court shall retain jurisdiction over this case

pending an appropriate determination of the relevant issues

 

15. The EPA's determination would, of course, be subject to
judicial review and thus would not be immune from challenge
if arbitrary, unreasonable, clearly contrary to the statute's
intended effect, or otherwise unlawful. See ABF Freight 
Sys., Inc. v. NLRB, 114 S. Ct. 835, 839 (1994); Brown v. 
Secretary of HHS, 46 F.3d 102, 106 (1st Cir. 1995). 

-33-

by the EPA.16 See Reiter v. Cooper, 113 S. Ct. 1213, 1220 

(1993) (explaining that court has discretion to retain

jurisdiction pending administrative referral or to dismiss

the case without prejudice).

The district court's order granting the motion for 

partial summary judgment is vacated. The case is remanded to 

the district court for primary jurisdiction reference to the 

EPA. The district court shall refer the matter to the EPA to 

determine whether FFC qualifies as one of the "cyanides" 

within the meaning of 40 C.F.R. 401.15 and 40 C.F.R. 

302.4, Table 302.4. No costs are awarded. 

 

16. In so doing, we note that BVE has placed the $5.8
million at stake here in an interest bearing escrow account. 
The Commonwealth's interests will be protected during the
stay. When we asked the Commonwealth at oral argument if any
additional protections would be required should the EPA's
primary jurisdiction be invoked, the Commonwealth sought
nothing further.

-34-