**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,**

v.

**AMEGO, INC., Defendant.**

**Civil Action No. 94–11967–GAO.**

United States District Court,
D. Massachusetts.

May 15, 1996.

Lisa Sirkin, E.E.O.C., New York City, Michael B. Ranis, New York City, for E.E.O.C.

Barry L. Mintzer, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Boston, MA, Mary Jo Hollender, Boston, MA, for Amego, Inc.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiff Equal Employment Opportunity Commission ("EEOC") brought suit against the defendant Amego, Inc., for alleged violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, in connection with Amego's discharge of an employee, Anne Marie Guglielmi. Amego has moved for summary judgment in its favor, and for the reasons set forth in this memorandum, the Court grants Amego's motion.

### I. FACTS [1]

Amego is a private charitable organization that provides residential, educational and behavioral services for autistic and severely behavior-disordered adolescents and adults. All Amego's clients are legally incompetent and almost all are substantially non-verbal. Additionally, Amego has a "zero-rejection policy," meaning that many of its clients have disabilities so profound that they have been rejected or discharged from other agencies that serve persons with autism.

---

1. For the purposes of summary judgment, the Court reviews the record and draws all reasonable inferences from the record in a light most favorable to the non-moving party, here the EEOC. *Commonwealth v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 986 (1st Cir.1995). Unless otherwise noted, all facts are derived from Amego's Statement of Undisputed Material Facts and the EEOC's Statement of Disputed Facts, adopting the EEOC's position where the two submissions disagree.

Amego is administered by a board of directors comprised of volunteers, an Executive Director, and several managerial employees. Employee staff members handle the direct care of Amego's clients. These direct care personnel are divided into three groups: behavior therapists, shift supervisors, and team leaders, each having progressively more responsibility. To care for its clients, Amego generally maintains a ratio of one staff member to two clients at any given time. From late 1990 until mid–1992, the time period relevant to this case, Amego provided services for twenty-five to thirty adolescent and adult males at a day treatment program in Quincy, Massachusetts, and at five residences in communities south of Boston.

Anne Marie Guglielmi began working for Amego as a behavior therapist in September, 1990, shortly after her graduation from college. She was promoted to team leader at Amego's residence in Mansfield, Massachusetts, in July, 1991. She performed well in both positions. Guglielmi applied for the position of program coordinator for the Mansfield residence in the spring of 1992 but was passed over in favor of another employee, who Amego management believed was more ready to take on that responsibility.

Guglielmi's employment at Amego coincided with a difficult period in her life. At about the same time she started working for Amego, she began to experience symptoms associated with bulimia and depression. She was diagnosed as bulimic and depressed in January, 1991, although she did not inform any of her supervisors or management of the diagnosis until more than a year later. Doctors prescribed Prozac and other medications for her during this time, but her condition did not improve much as a result. In late 1991, Guglielmi also started seeing Margaret Posever, a social worker, for weekly psychotherapy sessions.

Guglielmi began a relationship during this time with a co-worker. In September, 1991, the two began living together. The relationship was a source of further problems in Guglielmi's life. Most notably, it appears that her boyfriend was using cocaine, although Guglielmi claims she lacked full knowledge of this fact until late June, 1992.

On May 4, 1992, soon after Guglielmi learned that she would not receive the promotion she had sought, Guglielmi purchased nonprescription sleeping pills from a drug store and took an overdose. Her boyfriend discovered her, and she told him what she had done. He took her to an emergency ward, from which she was transported to a psychiatric hospital. She was released on the evening of May 4 but rehospitalized two days later until May 12 because of concerns her father and her boyfriend had about her safety.

Guglielmi returned to work on May 13, 1992. She did not tell any of her supervisors about the suicide attempt, although she did tell her immediate supervisor, Julie Dwyer Cleggett, that she had been hospitalized for bulimia and depression. Guglielmi also spoke with Cleggett about modifying her work schedule to attend therapy sessions two or three times per week. Cleggett agreed, although Guglielmi stopped going to the sessions after a few weeks.

Guglielmi's situation did not improve. She began seeing Dr. Kenneth Levin on May 21, 1992. Dr. Levin diagnosed her as suffering from bulimia and major depression and prescribed Prozac and trazodone. Guglielmi also continued to see Posever for weekly psychotherapy sessions, at which Guglielmi talked of suicidal thoughts and disclosed one brief episode in particular in which she felt she would overdose on trazodone. Guglielmi reported to Posever feeling under stress both at home and at work. Her stress at home came from her boyfriend and a stormy relationship with her mother. The work-related stress derived from her concern that she had not received the promotion, as well as additional responsibilities she had recently assumed because another team leader had recently taken maternity leave.

On June 13, 1992, Guglielmi attempted suicide again by ingesting a mixture of Prozac, trazodone, and aspirin. After swallowing the pills, Guglielmi called the police department and was transported to an emergency ward and then to the psychiatric hospital, where she remained until June 15, 1992. Guglielmi

told her health care providers that problems with her boyfriend and financial concerns had triggered this second suicidal incident. She also said that she was "not really depressed" when she overdosed this time and that she meant to provoke a reaction from her boyfriend rather than end her life. Guglielmi returned to work on June 17, 1992. She did not inform any of her supervisors that she had attempted to commit suicide through overdosing.

Also on June 17, 1992, Caryn Driscoll, Amego's Executive Director, and Karen Seal, Amego's Director of Administrative Services, conducted an interview with Guglielmi's boyfriend to discuss his excessive absences and tardiness. In the course of the interview he mentioned rumors he had heard about clients being drugged at the Fales Road residence, where he regularly worked and where Guglielmi had worked occasionally on an overtime basis. At about this same time, Driscoll learned that the Fales Road supply of the medication Klonopin was missing or being used at an accelerated rate. While Klonopin is usually prescribed to treat seizure disorders, it is also taken by cocaine users as an antidote to the stimulative effects of cocaine.

Driscoll initiated an investigation of the missing Klonopin on June 20, 1992, by having blood tests administered to the clients at Fales Road. The results showed that two clients for whom Klonopin had been prescribed had higher levels of the drug in their blood than called for by their prescription and that two others for whom Klonopin had not been prescribed had evidence of it in their blood. Driscoll responded by advising employees of the drug irregularities and requesting anyone with information to come forward and speak to her. Guglielmi volunteered to speak with Driscoll and did so on June 26, 1992. In the interview, at which an investigator retained by Amego was also present, Guglielmi finally related to Driscoll all of her problems, including her bulimia and depression, her two suicide attempts involving both prescription and non-prescription drugs, and the fact that the police had come to her residence once to take her to the

hospital. Driscoll also asked Guglielmi whether she had observed her boyfriend use cocaine or whether she had suspicions that he used cocaine. Guglielmi denied both. Shortly after the interview, Driscoll learned from the police about their visit to Guglielmi's (and her boyfriend's) apartment when she had tried to commit suicide. The police told Driscoll that they had confiscated a number of pills from the apartment that they had thought to be Klonopin.[2]

One week after the interview, Driscoll learned that the medication log at the Mansfield residence had been missing between June 5, 1992 and June 26, 1992. The shift supervisor who ordinarily maintained the log told Driscoll that he had conducted a thorough search of the house but could not find it. Guglielmi then helped to look for it and found it on June 26 behind the medication cabinet. The supervisor claimed to have looked there before and not seen it. The supervisor thought that someone must have placed it there after he looked but did not think Guglielmi was responsible for its being missing. *See* Hollender Aff. Ex. 12. After recovering the log, Driscoll had someone review it to determine whether it reflected any problems with the maintenance of or accounting for drugs at the Mansfield residence. Although it was determined that the supply of drugs there was excessively high, no conclusion was reached about whether any drugs were missing.

On July 1, 1992, Driscoll informed Guglielmi in writing that she had concerns about Guglielmi's ability to perform her present job functions, "including medication ordering, dispensing and shift supervision" and temporarily removed her from the team leader position in order to evaluate her ability to continue in that position or another available job. Specifically, Driscoll's letter indicated that Amego had been "made aware that your hospitalizations were the result of deliberate overdoses of prescription medications requiring emergency treatment. As a result of the difficulties which you are presently going through, I have concerns about your ability to perform your present job functions includ-

2. The EEOC asserts in its statement of disputed facts that the Klonopin was there because another Amego employee had put it or left it in the apartment.

ing medication ordering, dispensing and shift supervision." Driscoll also offered Guglielmi the opportunity to take a leave of absence, which Guglielmi briefly considered but ultimately rejected because she could not afford it and because she felt ready and able to continue as a team leader.

Also on July 1, Driscoll, with Guglielmi's consent, sent a letter to Posever to ask for her opinion as to whether Guglielmi could safely perform eleven duties, all set forth on a check list. The list included questions about the administration and ordering of prescription medications, including controlled substances, as well as her general ability to care for the safety of Amego's clients and ensure the safety of her co-workers. Posever and Guglielmi discussed the list and Posever checked each item. Guglielmi, but not Posever, then signed the list. Guglielmi returned the list to Driscoll on July 8. Driscoll found Posever's response inadequate and called Posever, requesting a medical opinion as to whether Guglielmi could perform the functions listed. Although Posever said that she thought Guglielmi could, she declined to state whether she thought Guglielmi was medically competent because she, Posever, was not a medical doctor.

Driscoll then obtained Dr. Levin's name from Guglielmi and sent him the same checklist on July 22, 1992, asking him for his opinion. Dr. Levin met with Guglielmi on July 27, and after discussing her situation with her concluded that there was "no significant or high likelihood or a likelihood of her stealing medications to overdose...." Deposition of Kenneth Levin at 1–54. Dr. Levin indicated to Driscoll in a letter that Guglielmi was not currently prescribed any psychotropic medication and that he saw "no difficulty with her returning to her regular position." Driscoll disregarded Dr. Levin's assessment, thinking it useless because of its wording and its failure to include or refer to the checklist.

On July 21, 1992, prior to Driscoll's attempt to contact Dr. Levin, four members of Amego's safety committee met to discuss Guglielmi's situation and whether she could safely perform the duties set forth on the list provided by Driscoll. The committee consid-

ered Guglielmi's overdoses, including her use of Prozac (which Amego dispensed to clients at the Mansfield residence), the fact that all direct care staff were called on to dispense client medications and had the opportunity for unsupervised access to that medication, Guglielmi's discovery of the medication log, and Posever's checklist response. The committee advised Driscoll that they did not believe Guglielmi could perform the medication-related duties of a team leader without endangering the safety of clients and that there was no other position she could fulfill.

On July 29, 1992, Driscoll terminated Guglielmi's employment with Amego.

## II. DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 327 (1st Cir.1996) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

The ADA provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). The ADA defines a qualified individual with a disability as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," giving due consideration "to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8). A "reasonable accommodation," which includes modifications and alterations to the conditions and manner of employment, is not required where it would impose an "undue

hardship" on the employer. 42 U.S.C. § 12111(9), (10).

■ Both sides appear to agree that this case ought to be fit into the familiar burden-shifting framework established in the context of discrimination actions under Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and elaborated in subsequent case law. Under that standard, as applied to disability discrimination cases, the plaintiff bears the burden of establishing a prima facie case by showing: (1) that she is a disabled person within the meaning of the ADA; (2) that she is qualified to perform, either with or without reasonable accommodation, the essential functions of the job; and (3) that she has suffered an adverse employment action from which an inference of unlawful discrimination arises.[3] *Price v. S–B Power Tool*, 75 F.3d 362, 365 (8th Cir.1996); *see also DeLuca v. Winer Indus.*, 53 F.3d 793, 797 (7th Cir. 1995); *Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir.1993), *cert. denied*, 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994).

In support of its summary judgment motion, Amego asserts that EEOC cannot carry its burden of proving that Guglielmi was qualified to perform as a team leader or in any other available position at Amego.[4] Amego does not argue that Guglielmi was not technically qualified to do the job. Guglielmi's evaluations generally reveal that she had performed well at Amego for over one and a half years. Her supervisors had promoted her from behavior therapist to team leader and she received favorable reviews in both positions. Although the record contains some indication that her performance may have declined in the spring of 1992, Amego does not assert that as a basis for her termination.

Rather, Amego's contention is that Guglielmi was not qualified to perform her specific job functions of administering and monitoring medication as a team leader. Three different questions are subsumed within that one assertion: (1) whether Guglielmi was qualified to handle medication; (2) whether that responsibility was an essential part of her job; and (3) whether Amego could have reasonably accommodated Guglielmi by altering her job or placing her in another position.

The primary challenge to Guglielmi's qualifications to handle medication relates to her two attempts to commit suicide by overdosing on prescription and nonprescription drugs. Amego contends that Guglielmi's conduct demonstrated that she could not reasonably be trusted around medication intended for administration to Amego's clients. The EEOC suggests that to infer a disqualification on this basis is inappropriate and, indeed, wrong. It contends that the suicide attempts were simply manifestations of Guglielmi's disability, and firing her for that reason amounts to forbidden discrimination.

■ There are at least two things wrong with the EEOC's position. First, Amego's reasoning makes good sense; a person who abuses her own medications should not be trusted with the potent (and similar) medications of other people, especially incompetents, for both her own and their safety. Amego was entitled to assess whether a person who had engaged in misuse of medication in the very recent past might be too great a risk to be employed in an environment where the temptation and opportunity for another episode of misuse would be present daily. *See Palmer v. Circuit Court of Cook County, Social Serv.*, 905 F.Supp. 499, 510 (N.D.Ill. 1995) ("It is axiomatic that an individual who poses a 'direct threat to the health or safety of other individuals in the workplace,' *see* 42 U.S.C. § 12113(b), is not qualified for the position unless the employer is able to make a reasonable accommodation...."). Second, under the ADA, Amego may discharge an

---

**3.** That is not the only possible formulation of the prima facie case, *see Muller v. The Hotsy Corp.*, 917 F.Supp. 1389, 1410 (N.D.Iowa 1996) (discussing two variations applied in federal courts), but the distinction ultimately does not matter in this case since all formulations include the proposition that the individual be otherwise qualified.

**4.** Amego has conceded for the purposes of this motion that Guglielmi suffered from a disability at the time of her discharge. *See Stradley v. Lafourche Communications, Inc.*, 869 F.Supp. 442, 443 (E.D.La.1994) (noting that depression can qualify as a disability under the ADA).

employee whose conduct disqualifies her from maintaining her position, even if that conduct is a product of the disability. In this respect, the Court agrees with the Tenth Circuit that it is well beyond the salutary purpose of the ADA to "adopt an interpretation of the statute which would require an employer to accept the egregious behavior" of a disabled employee "when that same behavior, exhibited by a nondisabled employee, would require termination." *Williams v. Widnall*, 79 F.3d 1003, 1007 (10th Cir.1996); *see also Newland v. Dalton*, 81 F.3d 904, 906–07 (9th Cir.1996); *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995); *Maddox v. University of Tennessee*, 62 F.3d 843, 848 (6th Cir.1995); *Little v. FBI*, 1 F.3d 255, 259 (4th Cir.1993); *cf. Taub v. Frank*, 957 F.2d 8, 11 (1st Cir.1992); *but see Teahan v. Metro–North Commuter R.R.*, 951 F.2d 511 (2d Cir.) (taking opposite position), *cert. denied*, 506 U.S. 815, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992). Translating that principle to this case, if Amego could consider an employee's misuse of prescribed medication in determining whether that person was qualified for a medication-handling position, it would not matter whether the demonstrated misuse had been brought about by a disability the person was suffering from.

■ The next issue, whether administering and monitoring medication is an "essential" feature of the team leader position, is not difficult. The EEOC concedes that team leaders are expected to administer medications and in most cases have access to medicine cabinets containing large quantities of drugs. The written description of the position indicates as much. In these circumstances it is clear that having access to and administering medication to Amego's clients is an essential part of performing the duties of a team leader.

The inquiry thus turns to the question of reasonable accommodation. The EEOC suggests that Amego could have accommodated its own reluctance to entrust Guglielmi with any medication responsibility by structuring its system in such a way as to prevent Guglielmi from having direct access to medication supplies and having someone else administer the clients' medications or at least

monitor her if she did it. In essence, the EEOC suggests that Amego could have had another employee perform one of the essential functions of Guglielmi's job. That is significantly different from making an accommodation that permitted *her* to fulfill her job function. It is, in point of fact, an implicit recognition that she cannot perform the function. The accommodation the EEOC suggests is to have Amego change its job description and divide between two employees what it has previously assigned to only one. The burden of this accommodation would be especially great in this case, because Amego is a small non-profit organization that can ill-afford the expense of duplicative employees.

■ Whether Amego could have made a reasonable accommodation by reassigning Guglielmi from team leader back to her prior position as a behavior therapist presents a closer question. Although an employer is not necessarily required to find alternative employment for an employee as a way of reasonably accommodating her, *see Lewis v. Zilog, Inc.*, 908 F.Supp. 931, 948 (N.D.Ga. 1995); *Mazzarella v. U.S. Postal Service*, 849 F.Supp. 89, 95 (D.Mass.1994), there is "no *per se* rule against transfers as reasonable accommodations." *Hurley–Bardige v. Brown*, 900 F.Supp. 567, 570 (D.Mass.1995); *see also School Board of Nassau County, Fla. v. Arline*, 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 1131 n. 19, 94 L.Ed.2d 307 (1987). Here, Guglielmi had performed the behavior therapist job prior to becoming a team leader, a behavior therapist position was vacant at the time Amego discharged Guglielmi, and Guglielmi asked for the position when told she would not be kept on as a team leader.

■ The problem is that the transfer would not have allayed Amego's legitimate concerns about Guglielmi's unsupervised contact with medications. A behavior therapist typically has less control over and contact with medication than a team leader, but even the EEOC acknowledges that all behavior therapists have access to medication, and indeed are expected to administer it sometimes in an unsupervised environment. It is also important to remember that these drugs are for clients who have no way of knowing whether they are receiving the proper

amount or type of medication (and have no way of complaining if they do not) The situation, even viewed in the light most favorable to the EEOC, remains rife with the potential for exactly the sort of misuse Amego says it feared. There would simply be no reasonable way to ensure that medications would stay out of Guglielmi's hands so long as she was an employee in the residence. To allow Guglielmi to function as a behavior therapist without duplicative monitoring would be to require Amego to run the risk of injury to Guglielmi or its clients. Such injury would not only be a bad thing in itself, but would also expose Amego to suit and potentially jeopardize its funding. The task of "reasonable accommodation" should not force Amego to bear such risks. In sum, the EEOC cannot establish that Guglielmi could perform the essential functions of her job with or without reasonable accommodation.

■ In addition, the Court does not believe that the EEOC can meet the third element of its prima facie case either. *See Price,* 75 F.3d at 365; *Leary v. Dalton,* 58 F.3d 748, 753–54 (1st Cir.1995). From the undisputed subsidiary facts in the record, there is no real showing that Amego discriminated on the basis of a disability. Rather, the evidence presented shows that Amego fired Guglielmi for specific, risk-laden behavior: misuse of potent medications. There is not the slightest suggestion that Amego's decision was the product of a general prejudice or of stereotyping because of Guglielmi's disability. Indeed, even viewed in a light most favorable to the EEOC, the facts show a willingness on Amego's part to accommodate Guglielmi to permit her to get treatment for her bulimia and depression. Amego acted to terminate her employment only when it learned of her conduct abusing medications. Even then, the undisputed record shows, Amego did not simply fire her, as it might legitimately have done, but rather sought to make sure it was not acting too hastily and to see if some accommodation might be made.[5] *Cf. Wynne v. Tufts Univ. School of Medicine,* 976 F.2d 791, 796 (1st

Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). Nor is there any evidence that Amego treated other non-disabled persons differently. *See Price,* 75 F.3d at 365. Finally, there is no evidence that Amego's fear of drug misuse was a pretext to discriminate against a bulimic depressive. *See Price,* 75 F.3d at 365–66.

The ADA prevents employers from discriminating against a "qualified individual with a disability because of the disability." 42 U.S.C. § 12112. Because there is no genuine issue of material fact that Guglielmi was not a qualified individual and that she did not suffer discrimination because of a disability, Amego's motion for summary judgment is GRANTED.

SO ORDERED.

---

**5.** In fact, it is an irony that this case can be brought under the ADA, which took effect on July 26, 1992, three days before Guglielmi's discharge, precisely because Amego did not act precipitously but instead tried to make a more careful decision about her situation and whether some reasonable accommodation to it might be made.